T.C. Memo. 1997-385


UNITED STATES TAX COURT


DONALD N. AND ROSEMARIE F. MERINO, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 14555-85.                    Filed August 21, 1997.


<u>Bernard S. Mark</u> and <u>Richard S. Kestenbaum</u>, for petitioners.

<u>Barry J. Laterman</u> and <u>Paul Colleran</u>, for respondent.



MEMORANDUM FINDINGS OF FACT AND OPINION


DAWSON, <u>Judge</u>:  This case was assigned to Special Trial
Judge Norman H. Wolfe pursuant to the provisions of section
7443A(b)(4) and Rules 180, 181, and 183.  All section references
are to the Internal Revenue Code in effect for the tax years in

issue, unless otherwise indicated. All Rule references are to the Tax Court Rules of Practice and Procedure. The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below.

OPINION OF THE SPECIAL TRIAL JUDGE

WOLFE, Special Trial Judge: This case is part of the Plastics Recycling group of cases. For a detailed discussion of the transactions involved in the Plastics Recycling cases, see Provizer v. Commissioner, T.C. Memo. 1992-177, affd. without published opinion 996 F.2d 1216 (6th Cir. 1993). The facts of the underlying transactions and the Sentinel recyclers in this case are substantially identical to those considered in Provizer.

In a notice of deficiency dated April 9, 1985, respondent determined deficiencies in petitioners' joint Federal income taxes for the years 1978, 1979, 1980, and 1981 in the respective amounts of $505, $12,647.87, $4,503, and $32,463. Respondent also determined that interest on the deficiencies accruing after December 31, 1984, would be calculated at 120 percent of the statutory rate under section 6621(c).[1]

---

[1] The deficiency notice refers to sec. 6621(d). This section was redesignated as sec. 6621(c) by sec. 1511(c)(1)(A) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2744 and repealed by sec. 7721(b) of the Omnibus Budget Reconciliation Act of 1989 (OBRA 1989), Pub. L. 101-239, 103 Stat. 2106, 2399, effective for tax returns due after Dec. 31, 1989, OBRA 1989 sec. 7721(d), 103 Stat. 2400. The repeal does not affect the instant case. For simplicity, we refer to this section as sec. 6621(c). The annual rate of interest under sec. 6621(c) for interest
(continued...)

In a first amendment to answer, respondent asserted additions to tax for negligence for the years 1978, 1979, and 1980 under section 6653(a) in the respective amounts of $25, $632, and $239,[2] and for 1981 under section 6653(a)(1) in the amount of $1,582, and under section 6653(a)(2) in the amount of 50 percent of the interest due on $31,645. Respondent also asserted an addition to tax for 1981 under section 6659 for valuation overstatement in the amount of $6,645.

The parties filed a Stipulation of Settled Issues concerning the adjustments relating to petitioners' participation in the Plastics Recycling Program. The stipulation provides:

> 1. Petitioners are not entitled to any deductions, losses, investment credits, business energy investment credits or any other tax benefits claimed on their tax returns as a result of their participation in the Plastics Recycling Program.
>
> 2. The underpayments in income tax attributable to petitioners' participation in the Plastics Recycling Program are substantial underpayments attributable to tax motivated transactions, subject to the increased rate of interest established under I.R.C. §6621(c), formerly section 6621(d).
>
> 3. This stipulation resolves all issues that relate to the items claimed on petitioners' tax returns resulting from their participation in the Plastics Recycling Program, with the exception of petitioners' potential liability for additions to the tax for valuation

---

[1](...continued)
accruing after Dec. 31, 1984, equals 120 percent of the interest payable under sec. 6601 with respect to any substantial underpayment attributable to tax-motivated transactions.

[2]     The deficiencies for 1978, 1979, and 1980 derived from disallowed credit carrybacks from 1981.

overstatements under I.R.C. §6659 and for negligence under the applicable provisions of Section 6653(a).

4.  With respect to the issue of the addition to the tax under I.R.C. §6659, the petitioners do not intend to contest the value of the Sentinel Recycler or the existence of a valuation overstatement on the petitioners' returns; however, petitioners preserve their right to contest the issue of whether I.R.C. §6659 is applicable under the facts and circumstances of this case.

The issues remaining in this case are:  (1) Whether petitioners are liable for the additions to tax for negligence under section 6653(a) for the years 1978, 1979, and 1980, and under section 6653(a)(1) and (2) for 1981; and (2) whether petitioners are liable for the addition to tax under section 6659 for underpayment of tax attributable to a valuation overstatement for 1981.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulated facts and attached exhibits are incorporated herein by this reference.

A.  The Plastics Recycling Transactions

This case concerns petitioners' investment in Northeast Resource Recovery Associates (Northeast), a limited partnership that leased seven Sentinel expanded polyethylene (EPE) recyclers. The transactions involving the Sentinel EPE recyclers leased by Northeast are substantially identical to those in the Clearwater Group limited partnership (Clearwater), the partnership considered in Provizer v. Commissioner, supra.  Petitioners have

stipulated substantially the same facts concerning the underlying transactions as we found in the Provizer case.

In transactions closely resembling those in the Provizer case, Packaging Industries, Inc. (PI), manufactured and sold seven Sentinel EPE recyclers to ECI Corp. for $981,000 each. ECI Corp., in turn, resold the recyclers to F & G Corp. for $1,162,666 each. F & G Corp. then leased the recyclers to Northeast, which licensed the recyclers to FMEC Corp., which sublicensed them back to PI. The sales of the recyclers from PI to ECI Corp. were financed with nonrecourse notes. Approximately 7.5 percent of the sales price of the recyclers sold by ECI Corp. to F & G Corp. was paid in cash with the remainder financed through notes. These notes provided that 10 percent of the notes were recourse but that the recourse portion of the notes was only due after the nonrecourse portion, 90 percent, was paid in full.

All of the monthly payments required among the entities in the above transactions offset each other. These transactions were done simultaneously. Although the recyclers were sold and leased for the above amounts under the structure of simultaneous transactions, the fair market value of a Sentinel EPE recycler in 1981 was not in excess of $50,000.

PI allegedly sublicensed the recyclers to entities that would use them to recycle plastic scrap. The sublicense agreements provided that the end-users would transfer to PI 100 percent of the recycled scrap in exchange for a payment from FMEC

Corp. based on the quality and amount of recycled scrap. Neither PI nor the end-users carried out the terms of the sublicense faithfully. In practice, those terms regularly were ignored.

Both Clearwater and Northeast leased Sentinel EPE recyclers from F & G Corp. and licensed those recyclers to FMEC Corp. Apart from leasing and licensing seven recyclers instead of six, the underlying transactions involving Northeast do not differ in any substantive respect from the Clearwater transactions considered in the Provizer case.

For convenience, we refer to the series of transactions among PI, ECI Corp., F & G Corp., Northeast, FMEC Corp., and PI as the Northeast transactions. In addition to the Northeast transactions, a number of other limited partnerships entered into transactions similar to the Northeast transactions, also involving Sentinel EPE recyclers and Sentinel expanded polystyrene (EPS) recyclers. We refer to these collectively as the Plastics Recycling transactions.

B.  Northeast Resource Recovery Associates

Northeast is a New York limited partnership that closed on October 7, 1981. Richard Roberts (Roberts) is the general partner of Northeast.

A private placement memorandum for Northeast was distributed to potential limited partners. Reports by F & G Corp.'s evaluators, Dr. Stanley M. Ulanoff (Ulanoff), a marketing consultant, and Dr. Samuel Z. Burstein (Burstein), a mathematics

professor, were appended to the offering memorandum. Ulanoff owns a 1.27-percent interest in Plymouth Equipment Associates and a 4.37-percent interest in Taylor Recycling Associates. Burstein owns a 2.605-percent interest in Empire Associates and a 5.82-percent interest in Jefferson Recycling Associates. Like Northeast, Plymouth Equipment Associates, Taylor Recycling Associates, Empire Associates, and Jefferson Recycling Associates are partnerships that leased Sentinel recyclers. Burstein also was a client and business associate of Elliot I. Miller (Miller), the corporate counsel to PI.

The Northeast offering memorandum states that the general partner will receive fees from Northeast in the amount of $25,000. The offering memorandum further states that the general partner "may retain as additional compensation all amounts not paid as sales commissions or offeree representative fees". According to the offering memorandum, it was anticipated that 10 percent of the proceeds from the offering--$95,000--would be allocated to the payment of sales commissions and offeree representative fees. Roberts therefore was to receive a minimum of $25,000 and up to $120,000 from Northeast.

The offering memorandum lists significant business and tax risk factors associated with an investment in Northeast. Specifically, the offering memorandum states: (1) There is a substantial likelihood of audit by the Internal Revenue Service (IRS), and the purchase price paid by F & G Corp. to ECI Corp.

probably will be challenged as being in excess of fair market value;[3] (2) Northeast has no prior operating history; (3) the general partner has no prior experience in marketing recycling or similar equipment; (4) the limited partners have no control over the conduct of Northeast's business; (5) there is no established market for the Sentinel EPE recyclers; (6) there are no assurances that market prices for virgin resin will remain at their current costs per pound or that the recycled pellets will be as marketable as virgin pellets; and (7) certain potential conflicts of interest exist.

The Sentinel EPE recycler had a "nuts and bolts", or manufacturing, cost of $18,000.  It was a simple batch type machine designed to grind expanded polyethylene foam and film into a densified form called "popcorn" that could be further processed to produce resin pellets suitable for some uses in the plastics industry.  The Sentinel EPE recycler was incapable of recycling low density polyethylene by itself and had to be used in connection with grinders, extruders, and pelletizers. Operation of the Sentinel EPE recycler was performed by low wage factory help with minimal training.  The Sentinel EPE recyclers

---

[3]    The offering memorandum notes that "Such purchase price is the basis for computing the regular investment and energy tax credits to be claimed by the Partnership" and that "if a challenge by the [Internal Revenue] Service with respect to the fair market value of the Sentinel Recyclers * * * were successfully made, all or part of the regular investment and energy tax credits * * * would be lost."

were placed with end-users that did not have sufficient amounts of scrap ever to pay off the notes on the machines. There is no evidence that FMEC Corp. ever made payments to end-users although on occasion PI made some payments for scrap produced by end-users.

Although the offering memorandum represented that the Sentinel EPE recycler was a unique machine, it was not. Specially designed systems for densifying polyethylene and polystyrene were commercially available prior to 1981 from such companies as Cumberland Engineering Division of John Brown Plastics Machinery and the NRM Corp. Ranging in price from $20,000 to $200,000, other plastics recycling machines available during 1981 included the Foremost Densilator, Nelmor/Weiss Densification System (Regenolux), Buss-Condux Plastcompactor, and Cumberland Granulator. See Provizer v. Commissioner, T.C. Memo. 1992-177. The Regenolux, for example, was fully capable of recycling expanded polyethylene or polystyrene, and worked better than either the Sentinel EPE or EPS recycler. It sold for $38,000 in 1981.

C. Richard Roberts

Roberts is a businessman and the general partner in Northeast and many other limited partnerships that leased and licensed Sentinel EPE recyclers. He also is a 9-percent shareholder in F & G Corp., the corporation that leased the recyclers to Northeast. From 1982 through 1985, Roberts

maintained the following office address with Raymond Grant (Grant), the sole owner and president of ECI Corp.:

> Grant/Roberts
> Investment Banking
> Tax Sheltered Investments
> 745 Fifth Avenue, Suite 410
> New York, New York  10022

Grant was instrumental in the hiring of Ulanoff as an evaluator of the Plastics Recycling transactions.  The two had met on a cruise.  Roberts and Grant together have been general partners in other investments.

Prior to the Northeast transactions, Roberts and Grant were clients of the accounting firm H. W. Freedman & Co. (Freedman & Co.).  Harris W. Freedman (Freedman), a certified public accountant (C.P.A.) and the named partner in Freedman & Co., was the president and chairman of the board of F & G Corp.  He also owned 94 percent of a Sentinel EPE recycler.  Freedman & Co. prepared the partnership returns for ECI Corp., F & G Corp., and Northeast.  It also provided tax services to John D. Bambara (Bambara).  Bambara is the 100-percent owner of FMEC Corp., as well as its president, treasurer, clerk, and director.  He, his wife, and his daughter also owned directly or indirectly 100 percent of the stock of PI.

D.  Petitioners and Their Introduction to Northeast Resource Recovery Associates

Petitioners resided in Tenafly, New Jersey, at the time their petition was filed.  Hereafter, reference to petitioner in the singular denotes Donald N. Merino.

Petitioner earned a master's degree in industrial engineering in 1963 and a Ph.D. in managerial economics in 1975. He has been a licensed professional engineer in industrial engineering and has been a member of the American Institute of Industrial Engineers, the American Society of Mechanical Engineers, and the National Society of Professional Engineers. Petitioner's professional experience includes employment with Standard Brands, Exxon Corp., Mobil Corp. (Mobil), and the Celanese Corp. (Celanese). At Mobil, petitioner worked as a financial analyst, a project manager for distribution facilities, and as a senior consultant for marketing and distribution in Mobil's international division. In the latter capacity he was employed in analysis of the economics of the oil business. Petitioner left Mobil after 10 years and in 1974 joined Celanese, where he remained employed through the tax years in issue.

Petitioner started at Celanese as manager of the hydrocarbons planning group of the company, which was the largest merchant buyer of ethylene in the United States. Celanese's primary business concerned hydrocarbons--plastics, chemicals, and fibers. According to petitioner, at one point Celanese was the 100th largest corporation in the United States and had revenues of approximately $4 billion. Celanese subscribed to services provided by nearly every major forecasting entity, including Arthur D. Little, Inc., the Stanford Research Institute, and Data Resources, Inc. It budgeted approximately $500,000 annually for

consultants and purchased a broad range of reports. Celanese also subscribed to numerous magazines and trade publications such as Chemical Reporter, Modern Plastics, Plastics World, and Plastics Technology. In 1975 or 1976, Celanese participated in a series of conferences presented by the Department of Energy (DOE) in connection with the National Energy Policy Plan. When the DOE published one of the periodic updates of the National Energy Policy Plan concerning energy projections in July 1981, Celanese held internal seminars analyzing the report and circulated internal reports commenting on its conclusions.

As manager of the hydrocarbons planning group at Celanese, petitioner forecasted prices for crude oil, ethylene, and related products, and helped establish a purchasing pattern for ethylene and propylene. Subsequent positions held by petitioner included director of the Celanese Chemical Co.; worldwide director of chemicals, plastics, and specialties for Celanese; corporate director of new business development; director of the quality program; and director of strategic business development. Petitioner was at various times responsible for "the planning and economics of" plastics, petrochemicals, chemicals, and capital expenditures; and new business ventures. In two of his positions, petitioner had responsibilities related to the budgeting and appropriation of funds for new materials and equipment such as extruders and machinery to manufacture plastics.

In 1981, through a nominee, petitioner acquired a 24-percent interest in two limited partnership units in Northeast for $24,000.[4] As a result of petitioner's investment in Northeast, on their 1981 return petitioners claimed an operating loss in the amount of $19,526.16, and investment tax and business energy credits totaling $22,431.29.[5] Petitioners carried back a total of $18,279 in unused business energy credits to their 1978, 1979, and 1980 returns.[6] Respondent disallowed petitioners' claimed operating loss and credits related to Northeast in full.

Petitioner learned of the Plastics Recycling transactions and Northeast from a personal friend Norman Lewis (Lewis), who was a C.P.A. Lewis was considering the Plastics Recycling transactions for some of his clients, and he asked petitioner to examine the proposal. Petitioner agreed to do so, and Lewis sent him the offering materials for Northeast and another Plastics Recycling partnership. Before and after reviewing the offering materials, petitioner spoke to Roberts. Petitioner questioned whether PI was "a real company" and whether it had a "real

---

[4] Petitioner's nominee was Norman Lewis (Lewis). Lewis acquired a 10.421050-percent interest in Northeast for $100,000. Petitioners therefore indirectly owned an approximately 2.5 percent interest in Northeast (24 percent x 10.421050 percent = 2.5 percent).

[5] Petitioners' interest in Northeast generated $20,355 in investment tax credits and $20,355 in business energy credits. However, their business energy credit was subject to limitation in the amount of $2,326.

[6] The record does not reveal the respective amounts of the claimed carrybacks to petitioners' 1978, 1979, and 1980 returns.

machine". Petitioner told Roberts: "If you have a demonstration of this, and I'm going to do this, I certainly understand the economics. I understand what you're trying to do, but I want to see it working." He explained: "I would never invest in anything unless I saw it".

Roberts suggested that petitioner visit the PI plant in Hyannis, Massachusetts, and arranged a date for him to visit. PI was located near a house on Cape Cod where petitioners vacationed at the time. At PI, petitioner spent the first "hour to two hours" in Bambara's office discussing and examining samples of plastics products made by PI. Bambara "asked [petitioner] to sign a secrecy agreement, and sort of twisted [his] arm a little bit about nondisclosure, and things like that." After signing the agreement, petitioner was allowed to tour the plant. Petitioner recalled that the PI representatives "were a little uncomfortable that somebody that knew plastics technology and plastics economics was going to visit the plant" and "were very reluctant to give me any information." According to petitioner, the PI representatives refused to give petitioner any of the information that he asked for, such as company records, purportedly because petitioner was there to perform due diligence and was not an investor.

Petitioner viewed a demonstration of the machine, which he recalled as follows:

> What they did was they took the plastic scrap that
> they were manufacturing * * * [and] ran it through one

of the machines, made the popcorn material.  Had a very small-barrelled extruder.  They ran it through the extruder.
And they took the pellets that came out of the extruder and they put it back in the process, which was very difficult to do, by the way, because they used cyclone feeding.
So, getting the pellets back in the process wasn't easy.

Petitioner observed at the demonstration:  "It worked.  You know, on the scale that they gave, everything worked."

Attorneys from the law firm of Windels, Marx, Davies & Ives (WMDI) visited the PI plant on the same day as petitioner.  WMDI prepared the offering memorandum, tax opinion, and other legal documents for all of the 1981 Plastics Recycling partnerships, including Northeast.  During a lunch break, petitioner asked the attorneys some questions about the legal aspects of the venture, such as whether the transactions qualified for the recently enacted safe-harbor leasing provisions of section 168(f). Petitioner "knew that the government was not happy with" nonrecourse leveraged lease transactions, and he considered the Northeast transaction to be "a classic leveraged lease deal."

After lunch petitioner questioned Bambara, particularly with respect to factors bearing on the price of resin, which he purportedly considered "the crucial part of the economics of this deal".  Petitioner understood that PI purchased resin at "a volume discount", but Bambara did not indicate the amount of the discount.  Petitioner also learned that because PI received resin shipments by truck instead of rail, it paid a penalty that

petitioner estimated at "about a 4-cent per pound penalty".  In addition, PI was not in a good location; trucks had difficulty getting in and out, especially during the summer, and therefore it also paid a "location differential" that petitioner estimated at several cents per pound.

Petitioner also questioned Bambara about the sources of PI's recyclable scrap.  Petitioner testified that in his view "it's difficult to make money in plastics recycling.  You need to have enough product in terms of the volume."  Petitioner understood from Bambara that PI's customers purchased plastic foam from an average of 3 to 5 suppliers.  Consequently, petitioner reasoned, "if the machines went to those suppliers, it was not only PI's volume that could supply those machines, but also two or three or four other suppliers could supply that".  Petitioner also understood from Bambara that PI had been working on the machine for "a long time" and had been using it in practice.  To confirm this claim, petitioner allegedly spoke to one of his Cape Cod neighbors who worked in PI's machine shop in Hyannis.  Petitioner claims that he understood from his neighbor that PI first began working on the Sentinel EPE recycler under a prior president at PI, and that it had been using the machine in practice.

Petitioner recalled being satisfied that the Sentinel EPE recycler was unique because it recycled 1- to 2-pound low density polyethylene foam.  He recalled:

        I was surprised that they could do this, the 1- to
    2-pound.  I read pretty much all the literature.

* * * [I]f somebody else had had a machine that did 1- to 2-pound low density polyethylene foam, you would have seen an article in one of the, you know, whatever, Modern Plastics, or Technology, whatever.

Petitioner stated that he was familiar with the Foremost Densilator, Regenolux, Buss-Condux Plastcompactor, and Cumberland Granulator. He attended a number of plastics shows and "pretty much all those companies advertised their goods to" Celanese. Also, Celanese had a technical laboratory where it "had pretty much just about every plastics machine, grinder, [and] piece of equipment that you can imagine to test for their customers", including "basically" all the machines mentioned. Petitioner asserted that he questioned the testing facility personnel about PI's reputation, the Sentinel EPE recycler, and other machines.

Petitioner used the projections in the Northeast offering memorandum to run "a series of sort of back of the envelope calculations to see whether or not the business made any sense from an economic standpoint." He described the Northeast transaction as "basically a closed loop deal", which "is very important to the economics of this". Petitioner analyzed the economics from both a full equity basis and a cash basis. In so doing, he did not give any consideration to the manufacturing costs of the recycler. Petitioner explained:

Manufacturing costs, per se, of this particular item is only a small part of the economics. In this particular case, I didn't really think it had much relevance to the decision.

Petitioner claims that after analyzing the projections on an equity and cash basis, he concluded that the economics of the transaction made sense.

Petitioner explained his consideration of the fair market value of the Sentinel EPE recycler as follows:

> When I looked at the price of the machine and the business deal, I looked at it as a business deal.  From a business perspective, * * * it's not just the price of the machine.  It's really the price of the business deal, of which the machine is one part of it.

> \* \* \* \* \* \* \*

> So, when you looked at it, you didn't look at it to see whether or not it costs $50,000 or $100,000 to build the machine.  You looked to see whether or not the overall economics justified that kind of investment and made sense.
> So it was really a systems, or a group look at the whole thing.

When asked for his assessment of the fair market value of the machine, petitioner replied:  "As part of the overall system, it was worth the million dollars that was in the prospectus." However, petitioner claimed that he could not properly place a value on the Sentinel EPE recycler if considered in isolation from "the overall system".

Price difficulties arose soon after petitioner invested in Northeast.  He recalled that even though the price of crude oil continued to rise during the latter part of 1981 and into the next year, the price of low density polyethylene actually decreased.  Petitioner visited PI to inquire about the machines during his summer vacation trips to Cape Cod, but became "very

discouraged after about maybe a year and a half or 2 years into this deal".  He "gave up after that point because then it really became apparent that the price of crude [oil] was really declining."  Petitioners never made a profit in any year from their participation in Northeast.

OPINION

We have decided a large number of the Plastics Recycling group of cases.  Provizer v. Commissioner, T.C. Memo. 1992-177, affd. without published opinion 996 F.2d 1216 (6th Cir. 1993), concerned the substance of the partnership transaction and also the additions to tax.  See also Singer v. Commissioner, T.C. Memo. 1997-325; Gottsegen v. Commissioner, T.C. Memo. 1997-314; Greene v. Commissioner, T.C. Memo. 1997-296; Kaliban v. Commissioner, T.C. Memo. 1997-271; Sann v. Commissioner, T.C. Memo. 1997-259 (and cases cited therein).  The majority of these cases, like the present case, raised issues regarding additions to tax for negligence and valuation overstatement.  We have found the taxpayers liable for such additions to tax in all but one of the opinions to date on these issues.

In Provizer v. Commissioner, supra, a test case for the Plastics Recycling group of cases, this Court (1) found that each Sentinel EPE recycler had a fair market value not in excess of $50,000, (2) held that the Clearwater transaction was a sham because it lacked economic substance and a business purpose, (3) upheld the section 6659 addition to tax for valuation

overstatement since the underpayment of taxes was directly related to the overstatement of the value of the Sentinel EPE recyclers, and (4) held that losses and credits claimed with respect to Clearwater were attributable to tax-motivated transactions within the meaning of section 6621(c). In reaching the conclusion that the Clearwater transaction lacked economic substance and a business purpose, this Court relied heavily upon the overvaluation of the Sentinel EPE recyclers.

Although petitioners have not agreed to be bound by Provizer, they have stipulated that their investment in the Sentinel EPE recyclers in this case is similar to the investment described in Provizer v. Commissioner, supra. The underlying transactions in this case, and the Sentinel EPE recyclers purportedly leased by Northeast, are the same type of transactions and same type of machines considered in Provizer v. Commissioner, supra.

Based on the entire record in this case, including the extensive stipulations, testimony of respondent's experts, and petitioner's testimony, we hold that the Northeast transaction was a sham and lacked economic substance. In reaching this conclusion, we rely heavily upon the overvaluation of the Sentinel EPE recyclers. Respondent is sustained on the question of the underlying deficiencies. We note that petitioners have explicitly conceded this issue in the stipulation of facts and stipulation of settled issues filed shortly before trial. The

record plainly supports respondent's determinations regardless of such concession. For a detailed discussion of the facts and the applicable law in a substantially identical case, see <u>Provizer v. Commissioner</u>, <u>supra</u>.

## A. Section 6653(a)--Negligence

Respondent asserted the additions to tax for negligence under section 6653(a)(1) and (2) for 1981, and under section 6653(a) for the years 1978, 1979, and 1980, in an amended answer. Because these additions to tax were raised for the first time in an amended answer, respondent has the burden of proof. Rule 142(a); <u>Vecchio v. Commissioner</u>, 103 T.C. 170, 196 (1994); <u>Bagby v. Commissioner</u>, 102 T.C. 596, 612 (1994).

Section 6653(a) for 1978, 1979, and 1980, and section 6653(a)(1) for 1981, impose an addition to tax equal to 5 percent of the underpayment if any part of an underpayment of tax is due to negligence or intentional disregard of rules or regulations. Section 6653(a)(2) for 1981 imposes an addition to tax equal to 50 percent of the interest payable with respect to the portion of the underpayment attributable to negligence or intentional disregard of rules or regulations.

Negligence is defined as the failure to exercise the due care that a reasonable and ordinarily prudent person would employ under the circumstances. <u>Neely v. Commissioner</u>, 85 T.C. 934, 947 (1985). The question is whether a particular taxpayer's actions in connection with the transactions were reasonable in light of

his experience and the nature of the investment or business.  See Henry Schwartz Corp. v. Commissioner, 60 T.C. 728, 740 (1973). When considering the negligence addition to tax, we evaluate the particular facts of each case, judging the relative sophistication of the taxpayers, as well as the manner in which they approached their investment.  McPike v. Commissioner, T.C. Memo. 1996-46.  Compare Spears v. Commissioner, T.C. Memo. 1996-341 with Zidanich v. Commissioner, T.C. Memo. 1995-382.

Petitioners contend that they were reasonable in claiming deductions and credits with respect to Northeast.  They maintain that petitioner "conducted a good faith investigation of the Northeast transaction and did not merely rely on the offering memorandum or other materials supplied by the investment vendor." Petitioners further assert that they reasonably expected to make a profit from Northeast because plastic is an oil derivative and the United States was experiencing a so-called oil crisis during the latter 1970's and early 1980's.

Petitioner's educational background and professional experience should have enabled him to make a reasonable and informed assessment of the Sentinel EPE recycler and the Northeast transaction.  His own testimony is that he reviewed the offering memorandum repeatedly; visited PI and viewed a demonstration of the machine; spoke with members of WMDI, Roberts, Bambara, and Celanese personnel; and analyzed the economics of the transaction.  However, the record in this case,

particularly the basic sham nature of the transaction, undermines critical aspects of petitioner's testimony and analysis and does not support the conclusions he purportedly reached with respect to the Sentinel EPE recycler and the Northeast transaction.

1.  Petitioner's Investigation of the Transaction Was Inadequate

The Northeast offering memorandum warned:  (1) Northeast had no prior operating history; (2) management of Northeast's business was dependent upon the general partner, who had no prior experience in marketing recycling or similar equipment; (3) the general partner had other business commitments that required a substantial portion of his time; (4) the general partner was required to devote only such time to Northeast as he, in his absolute discretion, deemed necessary; (5) the limited partners had no control over the conduct of Northeast's business; and (6) there was no established market for the Sentinel EPE recyclers. In addition, PI faced added costs because it shipped resin by truck instead of rail, and because PI was in an inconvenient location with high costs for supplies.

To some extent these added costs were offset by a volume discount PI purportedly received on its resin purchases. However, Bambara did not tell petitioner the amount of the discount, nor, for that matter, did he tell petitioner how much PI paid in added costs as a "location differential".  The PI representatives refused to provide petitioner with any of the records or information that he requested, ostensibly because he

"was doing due diligence and * * * was not an investor." Petitioner testified that he did not find this refusal odd. Yet petitioner was visiting PI as a potential investor; Roberts arranged for his visit because petitioner "would never invest in anything unless [he] saw it." Moreover, petitioner had signed a secrecy agreement, and the offering memorandum disclosed that PI did not intend to seek patent protection. Petitioner knew from experience that "it's difficult to make money in plastics recycling," even for a preeminent corporation such as Celanese. The business risk factors listed in the offering memorandum, PI's high costs, petitioner's knowledge of the basic difficulty in making money in plastics recycling, and the uncooperative attitude of the PI personnel in simply refusing to furnish any information concerning corporate finance or actual operating costs should have raised serious questions in petitioner's mind about the financial and economic viability of Northeast.

2. Petitioner Failed To Show That the Sentinel EPE Recycler was Unique

Petitioner claims that he concluded that the Sentinel EPE recycler was unique because it could recycle 1-to-2 pound density polyethylene. He testified:

> At that time--this is August of 1981--I was not aware, and neither were any of the people I talked to aware of any machines that [recycled] low density [polyethylene] down in the 1 and 2 pound range.

* * * * * * *

> I specifically asked people who were knowledgeable in the area whether they knew of anybody in that area, that anybody had produced. And, the answer was no.
> So I felt that from a technology standpoint that [PI] had worked on something unique.

Petitioner acknowledged that he was familiar with other plastics recycling machines, such as the Foremost Densilator, Buss/Condux Plastcompactor, Cumberland Granulator, and the Regenolux. Nonetheless, he contends that he understood from Celanese personnel that there was no recycler comparable to the Sentinel EPE recycler, and that he was unaware of any advertisements or articles pertaining to any comparable machines in any of the plastics industry trade journals.

However, respondent's expert witnesses, Richard S. Lindstrom (Lindstrom) and Steven Grossman (Grossman), testified otherwise. Lindstrom, who consulted in plastics and plastics equipment at Arthur D. Little, Inc. from 1956 until 1989, testified that "there were available in 1981 commercial units that could be purchased for $50,000 or less that were totally equal to the Sentinel EPE Recycler in function, product quality, and capacity." Grossman, who has a Ph.D. in Polymer Science and Engineering and was at the time a professor of Plastics Engineering at the University of Massachusetts-Lowell, testified that the Sentinel EPE recycler "represented no new technology to the plastics recycling industry at the time of its offering", and that comparable and "more efficient technology was available to recycle film/foam polyethylene scrap." See Gottsegen v.

Commissioner, T.C. Memo. 1997-314; Provizer v. Commissioner, T.C. Memo. 1992-177. Consistent with this expert testimony, petitioners stipulated that information published prior to the Plastics Recycling transactions indicated that several machines capable of densifying low density materials were already on the market in 1981. Moreover, the Northeast offering memorandum disclosed that FMEC could encounter significant competition, and that PI did "not intend to apply for a patent for protection against appropriation and use by others." Consequently, any unique capabilities of the Sentinel EPE recycler were subject to appropriation, and any competitive advantage derived therefrom would likely have been short lived. As an experienced business executive, petitioner knew or should have known that in the absence of patent protection, even if PI's machine had possessed advantageous design capabilities, those capabilities would soon have been incorporated into the designs of competitors if the characteristics of the PI machine had been of significant commercial value.

The offering memorandum also disclosed that "competition could adversely affect the amount of Additional Rent which the [recyclers] are anticipated to produce". This admission undermines petitioner's argument for a purported fair market value for the machine based upon a projected stream of royalty income. See Provizer v. Commissioner, supra. In his testimony,

petitioner did not directly address this matter of competition affecting the allegedly anticipated flow of income.

### 3. Petitioner's Argument Concerning Valuation of the Recycler Erroneously Requires Acceptance of a Sham Transaction as Though It Were Valid

With respect to the fair market value of the recycler, petitioner claims that he did not view the investment as a purchase of the machines standing alone, and that he did not "look at it to see whether or not it costs $50,000 or $100,000 to build the machine."  Instead, he "looked to see whether or not the overall economics justified that kind of investment and made sense."  Petitioner asserted that the Sentinel EPE recycler could not be valued in isolation from the Northeast transactions, but within the context of said transactions, he concluded that it was worth $1,162,666.

However, as petitioners stipulated, the fair market value of a Sentinel EPE recycler was not in excess of $50,000 in 1981. Respondent's expert Lindstrom testified that prices of commercially available machines that were similar to the Sentinel EPE recycler were in the range of $50,000 in 1981.  An example of a machine "that provided equivalent capability of recycling polyethylene and polystyrene film and foam waste", according to respondent's expert Grossman, was the Foremost Densilator, which had been available since 1978 and sold for approximately $20,000 in 1981.  Petitioner testified that he was familiar with the Foremost Densilator, as well as other plastics recycling

machines.  In view of the gross disparity in the prices of such other machines and the Sentinel EPE recycler, petitioner's purported valuation estimate was not reasonable.

Petitioner's testimony to the effect that the Sentinel EPE recycler was worth $1,162,666, within the context of the artificial Northeast transactions, is specious.  Petitioner's refusal to value the EPE recycler by itself and his insistence on valuing it only as part of an "overall system" amounts to considering the sham transaction as though it were a valid transaction.  In his calculations of value, petitioner allows an investment credit of 20 percent of $1,162,666 and allows depreciation on the basis of the same inflated value.  He treats the nonrecourse loans as though they were enforceable loans.  In his discussion, he ignores all possibility of competition from users of machines purchased for $50,000 or less.  In short, petitioner's valuation of the "overall system" is based on an artificial inflation of values in isolation from real-world prices or influences.  As the rapid collapse of the sham transaction demonstrated, the EPE machines were grossly overvalued by comparison with similar machinery.

### 4.  The Carmagnola Reports

In support of the reasonableness of his valuation estimate, petitioner submitted into evidence preliminary reports prepared for respondent by Ernest D. Carmagnola (Carmagnola), the president of Professional Plastic Associates.  Carmagnola had

been retained by the IRS in 1984 to evaluate the Sentinel EPE and EPS recyclers in light of what he described as "the fantastic values placed on the [recyclers] by the owners." Based on limited information available to him at that time, Carmagnola preliminarily estimated that the value of the Sentinel EPE recycler was $250,000. However, after additional information became available to him, Carmagnola concluded in a signed affidavit, dated March 16, 1993, that the machines actually had a fair market value of not more than $50,000 each in the fall of 1981.

We accord no weight to the Carmagnola reports submitted by petitioners. The projected valuations therein were based on inadequate information, research, and investigation, and were subsequently rejected and discredited by their author. In one preliminary report, Carmagnola states that he has "a serious concern of actual profit" of a Sentinel EPE recycler and that to determine whether the machines actually could be profitable, he required additional information from PI. Carmagnola also indicates that in preparing the report, he did not have information available concerning research and development costs of the machines and that he estimated those costs in his valuations of the machines.

Respondent rejected the Carmagnola reports and considered them unsatisfactory for any purpose, and there is no indication in the record that respondent used them as a basis for any

determinations in the notice of deficiency.  Even so, counsel for petitioners obtained copies of these reports and urge that they support the reasonableness of the value reported on petitioners' 1981 return.  Not surprisingly, counsel for petitioners did not call Carmagnola to testify in this case, but preferred instead to rely solely upon his preliminary ill-founded valuation estimates. (Carmagnola has not been called to testify in any of the Plastics Recycling cases before us.)  The Carmagnola reports were a part of the record considered by this Court and reviewed by the Court of Appeals for the Sixth Circuit in the Provizer case, where we held the taxpayers negligent.  We find in this case, as we have found previously, that the reports prepared by Carmagnola are unreliable and of no consequence.

5.  The Oil Pricing Argument

Petitioner testified that he reasonably expected to make an economic profit from Northeast and that speculation regarding crude oil prices "was the critical factor" in his decision to invest.  He indicated that the price of plastic is directly proportional to the price of crude oil, and that when he invested in Northeast, the prevailing opinion in both the public and private sectors was that, due to the so-called oil crisis, the price of crude oil was going to increase significantly.  As evidence of such speculation, petitioners placed into the record several articles from Modern Plastics, dated April 1980, May 1981, and August 1981, and an energy projections report from the

DOE, published in July 1981.  The prefatory overview to the DOE report, however, cautioned about "the tremendous uncertainties underlying energy projections" and warned "that [the] projections [in the report] do not constitute any sort of blueprint for the future."  Reflective of such uncertainties, the April 1980 Modern Plastics article contemplated resin price hikes, while the May 1981 article predicted a leveling of prices, market disruptions, and an industrywide shakeout.

In contrast to petitioner's testimony, respondent's expert Grossman explained that the price of plastics materials is not directly proportional to the price of oil.  In his report, Grossman stated that less than 10 percent of crude oil is utilized for making plastics materials and that studies have shown that "a 300% increase in crude oil prices results in only a 30 to 40% increase in the cost of plastics products."  An even greater disparity was reported in the May 1981 article from Modern Plastics, which stated:  "A rule-of thumb unproven by cost-accounting but apparent from price history is that with every $1/barrel hike for Saudi marker crude, the per-pound price of ethylene increases by about half a cent."  (Emphasis added.)  Indeed, petitioner recalled that during the latter part of 1981 and for some months thereafter, while the price of crude oil rose, the price of low density polyethylene actually decreased.

Petitioners' reliance on Krause v. Commissioner, 99 T.C. 132 (1992), affd. sub nom. Hildebrand v. Commissioner, 28 F.3d 1024

(10th Cir. 1994), and Rousseau v. United States, 71A AFTR 2d 93-4294, 91-1 USTC par. 50,252 (E.D. La. 1991), is misplaced. In the Krause case, the taxpayers invested in limited partnerships whose investment objectives concerned enhanced oil recovery (EOR) technology. The Krause opinion states that during the late 1970's and early 1980's, the Federal Government adopted specific programs to aid research and development of EOR technology. In holding that the taxpayers in the Krause case were not liable for the negligence additions to tax, this Court noted that one of the Government's expert witnesses acknowledged that "investors may have been significantly and reasonably influenced by the energy price hysteria that existed in the late 1970's and early 1980's to invest in EOR technology." Krause v. Commissioner, supra at 177. Similarly, in Rousseau v. United States, supra, the District Court rejected the negligence additions to tax because, inter alia, the property underlying the investment was equipment capable of producing ethanol, which was widely considered at that time to be a viable fuel alternative to oil, and its potential for profit was apparent.

In the present case, however, as explained by respondent's expert Grossman (and the May 1981 Modern Plastics article submitted by petitioners), the price of plastics materials is not directly proportional to the price of oil. The Krause and Rousseau cases involved ventures in which the so-called oil crisis provided a reasonable basis for the respective taxpayers'

decisions to invest.  EOR was in the forefront of national policy and the media during the late 1970's and 1980's, and ethanol was widely considered to be a viable fuel alternative to oil.  In contrast, there is no showing in the record of this case that the so-called energy crisis would provide a reasonable basis for petitioners' investing in recycling of polyethylene, particularly in the machinery here in question.  Accordingly, we do not consider petitioners' arguments with respect to the Krause and Rousseau cases applicable.

Petitioners also cite a number of cases in which courts rejected the negligence additions to tax because the taxpayers reasonably relied upon offering materials and/or qualified expert advice.  Mollen v. United States, 72 AFTR 2d 93-6443, 93-2 USTC par. 50,585 (D. Ariz. 1993); Brifman v. Commissioner, T.C. Memo. 1992-375; Gralnek v. Commissioner, T.C. Memo. 1989-433; Butler v. Commissioner, T.C. Memo. 1985-613.  However, we are not convinced that petitioner placed a great deal of reliance on the offering materials.  The record shows that petitioner did not give due consideration to many of the caveats and warnings contained in the offering memorandum, particularly the business risk factors and PI's express disregard for patent protection.  With respect to expert advice, petitioner's own testimony is the only account in the record regarding any discussions he had with others, and he did not adequately relate the substance of any advice he may have received.  The record does not convince us that petitioner

reasonably relied upon the offering memorandum or any expert advice. Accordingly, we consider petitioners' reliance on the Mollen, Brifman, Gralnek, and Butler cases misplaced.

6. Conclusion

In view of petitioner's educational background and extensive experience in plastics and the nature and extent of his investigation, he learned or should have learned that the Sentinel EPE recycler was not unique and not worth in excess of $50,000, and that Northeast lacked economic substance and had no potential for profit. Petitioner's self-serving testimony to the contrary is not credible, and this Court is not required to accept it as true. Wood v. Commissioner, 338 F.2d 602, 605 (9th Cir. 1964), affg. 41 T.C. 593 (1964); Niedringhaus v. Commissioner, 99 T.C. 202, 212 (1992); Tokarski v. Commissioner, 87 T.C. 74, 77 (1986); Snyder v. Commissioner, T.C. Memo. 1995-285; Sacks v. Commissioner, T.C. Memo. 1994-217, affd. 82 F.3d 918 (9th Cir. 1996). In contrast, the reports of respondent's experts Lindstrom and Grossman, which reach opposite conclusions from petitioner's, are reasonable and persuasive, and the testimony of these experts is supported by other portions of the record. See Gottsegen v. Commissioner, T.C. Memo. 1997-314; Provizer v. Commissioner, T.C. Memo. 1992-177.

Under the circumstances of this case, petitioners failed to exercise due care in claiming a large loss deduction and tax credits with respect to Northeast on their Federal income tax

returns for the years 1978, 1979, 1980, and 1981.  The direct reductions claimed on petitioners' tax returns for those years, from the investment tax credits alone, equaled 170 percent of their cash investment.  Therefore, like the taxpayers in Provizer v. Commissioner, supra, "except for a few weeks at the beginning, petitioners never had any money in the * * * [Northeast transaction]."  The record shows that petitioner was on notice that the Northeast transaction was a sham transaction primarily intended to generate tax benefits, and that his decision to invest was tax driven, not economically driven.  See Zfass v. Commissioner, 118 F.3d 184 (4th Cir. 1997), affg. T.C. Memo. 1996-167.  We hold, upon consideration of the entire record, that petitioners are liable for the negligence additions to tax under section 6653(a) for 1978, 1979, and 1980, and under section 6653(a)(1) and (2) for 1981.  Respondent is sustained on this issue.

B.  Section 6659--Valuation Overstatement

In the amended answer, respondent asserted that petitioners were liable for the section 6659 addition to tax on the portion of their underpayment attributable to valuation overstatement. Because the section 6659 addition to tax was raised for the first time in the amended answer, respondent has the burden of proof. Rule 142(a); Vecchio v. Commissioner, 103 T.C. at 196; Bagby v. Commissioner, 102 T.C. at 612.

A graduated addition to tax is imposed when an individual has an underpayment of tax that equals or exceeds $1,000 and "is attributable to" a valuation overstatement. Sec. 6659(a), (d). A valuation overstatement exists if the fair market value (or adjusted basis) of property claimed on a return equals or exceeds 150 percent of the amount determined to be the correct amount. Sec. 6659(c). If the claimed valuation exceeds 250 percent of the correct value, the addition is equal to 30 percent of the underpayment. Sec. 6659(b).

Petitioners claimed tax benefits, including investment tax credits and business energy credits, based on a purported value of $1,162,666 for each Sentinel EPE recycler. Petitioners concede that the fair market value of a Sentinel EPE recycler in 1981 was not in excess of $50,000. Therefore, if disallowance of petitioners' claimed tax benefits is attributable to such valuation overstatement, petitioners are liable for the section 6659 addition to tax at the rate of 30 percent of the underpayment of tax attributable to the tax benefits claimed with respect to Northeast.

Petitioners contend that respondent erroneously failed to waive the section 6659 addition to tax. Section 6659(e) authorizes respondent to waive all or part of the addition to tax for valuation overstatement if taxpayers establish that there was a reasonable basis for the adjusted bases or valuations claimed on the returns and that such claims were made in good faith.

Respondent's refusal to waive a section 6659 addition to tax is reviewable by this Court for abuse of discretion. Krause v. Commissioner, 99 T.C. at 179. Abuse of discretion has been found in situations where respondent's refusal to exercise such discretion is arbitrary, capricious, or unreasonable. See Mailman v. Commissioner, 91 T.C. 1079 (1988); Estate of Gardner v. Commissioner, 82 T.C. 989 (1984); Haught v. Commissioner, T.C. Memo. 1993-58.

We note initially that there is no showing in the record that petitioners timely requested a waiver. We are reluctant to find that respondent abused any discretion in this case when respondent was not timely requested to exercise it and there is no direct evidence of any abuse of administrative discretion. Haught v. Commissioner, supra; cf. Wynn v. Commissioner, T.C. Memo. 1995-609; Klieger v. Commissioner, T.C. Memo. 1992-734.

However, we do not decide this issue solely on petitioners' failure timely to request a waiver but instead, we have considered the issue on its merits. Petitioners urge that petitioner "did all that one could reasonably be expected to do" in deciding on the valuation claimed on their 1981 tax return. However, as we explained above in finding petitioners liable for the negligence additions to tax, petitioner's purported conclusion with respect to the fair market value of the Sentinel EPE recycler was not reasonable. In view of his extensive knowledge and experience in plastics, and the resources readily

available to him, petitioner learned or should have learned that the Sentinel EPE recycler was not worth in excess of $50,000 in 1981.

In support of their contention that they acted reasonably, petitioners cite Mauerman v. Commissioner, 22 F.3d 1001 (10th Cir. 1994), revg. T.C. Memo. 1993-23, and Rousseau v. United States, 71A AFTR 2d 93-4294, 91-1 USTC par. 50,252 (E.D. La. 1991). However, we consider the Mauerman case and the Rousseau case (for the same reasons discussed supra) distinguishable. In Mauerman, the Court of Appeals for the Tenth Circuit held that the Commissioner had abused discretion for not waiving a section 6661 addition to tax. Like section 6659, a section 6661 addition to tax may be waived by the Commissioner if the taxpayer demonstrates that there was reasonable cause for his underpayment and that he acted in good faith. Sec. 6661(c). The taxpayer in Mauerman reasonably relied upon independent attorneys and accountants for advice as to whether payments were properly deductible or capitalized. In the present case, however, the record fails to establish that petitioner reasonably relied upon any independent, expert advice. None of the persons that petitioner purportedly spoke with testified in this case, and petitioner's self-serving testimony is unpersuasive. Consequently, we consider petitioners' reliance on the Mauerman and Rousseau cases inapplicable.

For the same reasons that we held petitioners negligent, supra, we hold that petitioners did not have a reasonable basis for the adjusted basis or valuation claimed on their tax return with respect to the investment in Northeast.  The record in this case does not establish an abuse of discretion on the part of respondent but supports respondent's position.  We hold that respondent's refusal to waive the section 6659 addition to tax in this case is not an abuse of discretion.  Petitioners are liable for the section 6659 addition to tax at the rate of 30 percent of the underpayment of tax attributable to the disallowed tax benefits.  Respondent is sustained on this issue.

Decision will be entered

under Rule 155.